Whitaker, Judge,
concurring in part and dissenting in part:
The 1954 amendment to the overtime Act gives the Department head authority to pay premium compensation for overtime work on an annual basis. The Department head in these cases decided that the situation in the San Francisco and Omaha offices did not warrant authorizing this premium pay on an annual basis; hence, it seems to me to follow that, so far as these employees were concerned, the amendment made by the 1954 Act was inapplicable to them, and that their rights are governed by the prior Act, to wit, the Federal Employees Pay Act of 1945, 59 Stat. 295.
I agree that the overtime worked by the plaintiffs in these cases was induced by those having authority to do so and that this is equivalent to their having been ordered to do so when the occasion demanded. However, the purpose of the statutory requirement that overtime was allowable only when it was “officially ordered or approved,” was to repose discretion for the determination of the necessity for the overtime work on an authorized official, and not to leave it to the employee’s own discretion. In order for plaintiffs to recover I think it is necessary to show that one of two things happened, either that an authorized officer, not generally ordered overtime, but ordered it in each particular case; or, if he did not order it, that he thereafter approved it.
*179 As I said in the begining, there is no doubt about the fact that employees were induced to work overtime when the situation demanded it. But I think it was still necessary for an authorized person to give his stamp of approval to the fact that the particular situation in each case demanded the overtime work.
It seems to me that this requirement has been met. When the individual investigator filed his report, showing overtime worked, and this was approved by his supervisor, and these reports were sent to the office of the person who had the authority to order or approve overtime, and this official took no action with respect to it, his inaction constitutes approval. The purpose of sending him these reports was to apprize him of what was going on, including what overtime each employee had worked. He had general knowledge that the employees of this office as a matter of practice worked overtime. Indeed, he had encouraged it, and said that he expected it. It was a part of the purpose of these reports to let him know whether or not they were doing so. He is charged with knowledge of their contents, and his failure to disapprove of the overtime shown on them amounts to an approval of it.
Since the Department head made the 1954 amendment inapplicable to the offices in which plaintiffs worked and, therefore, they are not entitled to recover under it, they, perforce, are entitled to recover under the Federal Employees Pay Act of 1945 as it was before the 1954 amendment.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
1. During all or part of the period involved in this litigation, plaintiffs were employed as criminal investigators in the Alcohol and Tobacco Tax Division, United States Treasury Department.[1] At all times here material they were in the classified Civil Service of the United States. They sue *180 to recover additional compensation for work in excess of 40 hours per week, for night differential and for holiday pay, pursuant to the provisions of the Federal Employees Pay Act of 1945, 59 Stat. 295, as amended. These plaintiffs are citizens of the United States.
2. The Alcohol and Tobacco Tax Division was established in 1934 as a unit of the Bureau of Internal Revenue, United States Treasury Department. It is a compact, self-sustaining organization within the Internal Revenue Service, the activities of which are coordinated with the functions of other divisions of the Service and with other enforcement agencies of the Treasury Department. The Division administers and enforces all Internal Revenue laws and regulations relating to distilled spirits (including alcohol) and other alcoholic beverages and products; tobacco materials, tobacco products, cigarette papers and tubes; the National and Federal Firearms Acts; the Federal Alcohol Administration Act, relating to interstate and foreign commerce in distilled spirits, wines, and beer; the Liquor Enforcement Act of 1936; and related laws. The United States Treasury obtains between $5 and $6 billions annually in taxes from legitimate liquor industries. The activities of the Alcohol and Tobacco Tax investigators in the entire United States are a direct as well as an indirect factor in the collection of this revenue.
The activities of this unit fall into two basic categories[1]— permissive and enforcement. The permissive branch has to do with the administration of laws relating to the legitimate production and distribution of liquors, liquor products, tobacco materials, tobacco products, and cigarette papers and tubes. Enforcement has to do primarily with the suppression of the nontaxpaid liquor and tobacco traffic, and illegal traffic in firearms. This involves the detection of violations, apprehension of offenders, seizure of contraband and means and instruments used in the commission of crimes, and the obtaining of evidence.
The Alcohol and Tobacco Tax Division is headed by a director. The enf orcement branch of this Division, in Washington, D.C., is headed by a chief, who operates under the supervision of the director. The chief, enforcement branch, is in charge of the enforcement offices of the Division at head *181 quarters, in Washington, D.C. There are nine regions of the Internal Revenue Service, each under the supervision of a commissioner. In each of those regions there is an assistant regional commissioner, Alcohol and Tobacco Tax, subject to the general direction of the regional commissioner. Each assistant regional commissioner has a chief of enforcement branch, who directs and supervises the activities of the investigators. Within the nine regional areas there are 36 branch offices, located strategically throughout the United States. Each branch office has a supervisor-in-charge, who directs the activities of the investigators. In the area embraced within a branch office, there may be one or more posts. These may be manned by one or more investigators headed by a group leader or investigator-in-charge. Special investigators handle violations of an interstate character involving conspiracies, but perform in the main the same work as investigators.
During the period involved in this litigation, the Alcohol and Tobacco Tax Division employed an average of 900 investigators and special investigators throughout its nine regions. Of this total, approximately 50 were employed in the San Francisco Region and a similar number in the Omaha Region. Plaintiffs were required to take an oath of office, as were all other employees, to “well and faithfully discharge the duties of [the] office.”
3. In addition to routine office duties, plaintiffs, in discharge of their official responsibilities, were required on occasion to perform or be available for performance of a wide range of duties as follows: Conduct investigations, develop sources of information including the cultivation of informers, maintain public relations, cooperate with other federal and nonfederal law-enforcement agencies, carry out surveillance or observation of suspected persons or premises, perform general patrolling and undercover work, conduct raids and engage in pursuits, obtain and serve search warrants, carry out arrests, perform seizures and searches of premises, interrogate suspects and witnesses, prepare cases for trial, be present at arraignments, confer with prosecuting attorneys, conduct raw-materials investigations, carry out petition investigations on behalf of persons claiming liens upon property seized from violators or suspects, conduct retailer- *182 liquor-dealer investigations and inspections, investigate petitions for refund of occupational tax, issue permits for home manufacture of wine and check on suspected illegal home manufacture of wine, investigate matters pertaining to the licensing, registration, transfer, and transportation of firearms under the Federal Firearms Act and under the National Firearms Act, check on the purchase and use by retail liquor dealers of special tax stamp required, collect delinquent taxes from retail liquor dealers, investigate violations by wholesale beer and liquor dealers, and file numerous reports.
In addition, the plaintiffs were officially required to take an in-service correspondence training program, consisting of approximately 20 subjects pertaining to law enforcement, including such subjects as the law of arrest, search and seizure, evidence, and federal criminal procedure, taking of fingerprints, operation of a radio, manner of writing reports, conduct of raids, operation of motor vehicles in pursuit, and use of firearms. They were expected to complete the study of each subject within 30 days and submit a written report on the subject or explain why this was not done. They also received various manuals and memoranda for study and were required to keep abreast of revisions, necessitating handwritten insertions and changes in order to keep their official files up to date.
In the early part of the period involved in this litigation some of the plaintiffs engaged in investigations under the Federal Tort Claims Act involving Internal Revenue personnel in connection with traffic accidents. It was also part of plaintiff’s duties to carry out inspections with a view to ascertaining that cigarettes had proper stamps, but there is no evidence that this duty consumed substantial time. Plaintiffs’ duties also included special details such as instructing in road tests for Internal Revenue personnel, coaching in the use of firearms, photographing Internal Revenue sites and buildings, exhibiting training films, etc.
Plaintiffs’ official responsibilities extended over the territory assigned to their respective posts of duty. Such térritory was usually very extensive, but the incidence of violations was low. They were required to patrol outside their immediate posts of duty for general policing and in *183 spections not limited to actual specific investigations in order to become familiar with the terrain and to deter violations.
The Civil Service Commission (in a document issued in December 1955) described the position of a Treasury criminal investigator, in part, as follows:
* * * An agent may be frequently called upon to serve in an undercover capacity requiring that he live and associate with criminals for lengthy periods. * * * Performance of these duties may require work at irregular hours, involve personal risks, exposure to all kinds of weather, arduous physical exertion u/nder rigorous and unusual environmental conditions, and considerable travel. * * *
In a U.S. Treasury Department publication in 1959 it was stated: “* * * The perils and difficulties regularly faced by alcohol tax investigators are as severe as any encountered by other law-enforcement groups, ranging from prolonged loss of sleep to sudden death.”
In many cases the plaintiffs had no stenographic or clerical help. Sometimes they had only limited access to a telephone. They were required to maintain 15 to 20 different files relating to matters such as known violations, suspected violations, automobile files, Government-equipment files, daily report files.
4. Plaintiff’s activities were largely self-assigned. The immediate supervisor would, from time to time, assign a project to an investigator. On rare occasions an assignment would be made by the regional office, but the preponderance of the work was initiated by the investigators. Plaintiffs did not carry out their duties solely by acting on information received; they were operating under the continuous duty to exercise initiative and to seek information in the various areas of law enforcement within their competence. If an investigator was of the opinion that it was desirable for such purpose that he leave his post of duty to go to an outlying part of the area assigned to him, he would do so without having to seek the permission of his superior. Civil Service and Treasury Department publications, as well as the position descriptions of the plaintiffs, consistently stress the responsibility of the plaintiffs to exercise independent judg *184 ment and discretion, when necessary for the timely and efficient performance of duty.
Plaintiffs’ work was organized in terms of investigations or cases, but some plaintiffs spent most of their time on other assigned duties. Investigations, sometimes referred to as local investigations, would be initiated whenever the information received indicated a proper basis for such action. In the Omaha Region, some investigations would be formalized by the use of form OR-5-16, and assigned a number. An investigation, regardless of how it was initiated, might mat-ture into a “case” when, in the judgment of the investigator, enough evidence was obtained to warrant the submission of a report to the United States Attorney or to warrant an arrest, in which case a final criminal case report would be prepared and submitted. Cases containing the elements of a conspiracy were known in the Division as “jacketed” cases, and would normally involve one or more special investigat-tors, in addition to criminal investigators. Other criminal cases were referred to as “unjacketed.” Cases may be initiated on the basis of information received from local law-enforcement officers, informers, private citizens, or on the basis of knowledge gained independently by an investigator. The majority of investigations were local in character. A relatively small percentage of investigations resulted in “cases.” The bulk of one investigator’s time might be spent on investigations which never resulted in case reports, whereas the bulk of another investigator’s time would be spent on duties unrelated to a specific investigation or case.
Once started, the criminal investigator would determine when and whether an investigation should be discontinued. It was also the investigator’s individual responsibility to determine priorities between various investigations with which he might be concerned at a given time, in the absence of specific instructions from his superiors. While the investigator often had the cooperation of his superiors in the conduct of an investigation, the primary responsibility was his, and he was charged with a duty to bring his investigations to their final conclusion by discontinuance or a request for prosecution. From the viewpoint of law enforcement, a negative finding or a discontinuance of an investigation is an important result of duty performed.
*185 Preventive and deterrent activities were a part of plaintiffs’ duties. The effectiveness of plaintiffs’ enforcement activities involved knowledge of the permissive or legal liquor production or distribution establishments. Inspection of sources of raw materials or containers which might be used in the production or distribution of illicit liquor was a phase of plaintiffs’ preventive activities in that it might tend to reduce the incidence of manufacture and distribution of nontaxpaid liquors. While the development of a raw-materials “case” seldom occurs, that type of work must be accorded some consideration.
5. The position descriptions of plaintiffs provide: “As an incidental requirement, the incumbent is required to operate a Government-owned motor vehicle on public highways at any hour of the day or night in connection with his assigned duties.” The plaintiffs did, in fact, do much travel in the performance of their duties. Testimony in the case of one criminal investigator indicated that he traveled approximately 25,000 miles in one year, and that approximately 60 percent of his duties required some travel. Plaintiffs were supplied with Government-owned automobiles which were stored in contract garages, and some plaintiffs were also authorized by the assistant regional commissioner (Alcohol and Tobacco Tax Division) to maintain them at their homes, so that they would be readily available at night and on days not included within the regular 40-hour administrative workweek. The plaintiffs used the cars in their own discretion, and were never required to obtain prior approval for their use, but use of such automobiles was strictly limited to official purposes. Unauthorized use of such cars could result in severe disciplinary consequences to the individual involved.
A daily report on the operation of the Government-owned automobile was made on a special form carried in the vehicle. In addition, form 1494 provided for entries concerning the use of the automobile, and a special monthly report showed the number of days and the reason a vehicle was stored at the investigator’s home. Usually, the Government paid directly for the maintenance and repairs of these vehicles to the contract garage, and plaintiff would obtain gasoline and *186 oil on a Government-issued credit card. Plaintiffs were authorized to pay cash for fuel, supplies, and services, and they did so under certain conditions.
The forms used for reporting travel during the regular administrative workweek were also used for reporting travel in connection with overtime activities. They were accorded similar treatment. The defendant reimbursed the plaintiffs for expenses incurred in connection with the operation of the Government-owned automobiles incidental to the performance of overtime work. The immediate supervisors, the supervisors-in-charge, and regional officials had knowledge of this activity of the plaintiffs. No evidence was adduced to show disapproval or criticism of any of the plaintiffs due to their use of Government vehicles in connection with overtime work or with respect to expenditures incurred in connection with use of such vehicles. Defendant’s supervisory officials had ample opportunity to satisfy themselves concerning the necessity for the use of Government automobiles through the information furnished in various written reports.
Automobile travel may be described as arduous because of unfavorable terrain, when performed late at night, during inclement weather, or at high speeds. The automobiles supplied by the defendant to the plaintiffs were, useful for such purposes as a meeting place, observation post, radio communication center, a depository for secured evidence, a place for testing the alcohol content of liquors and as a place for storing kits of food, first aid equipment, special apparel, binoculars, shovels, and photographic and fingerprinting equipment. These items and tasks were deemed necessary to the plaintiffs for the purpose of properly discharging their duties. It is impossible to separate the travel aspect of plaintiffs’ work from the performance of many duties with which they are charged as criminal investigators. This simply means that travel is essential to efficient performance of duties involved. The record indicates that this fact has been recognized by defendant in various ways which have included reimbursement for the upkeep and operation of the automobiles used and payment of per diem to the investigator when he is in a travel status away from *187 his official base. Certain individual plaintiffs have listed, as overtime hours of work, the time spent in a travel status, without establishing that the travel was arduous or that it otherwise met the requirements set out in 5 U.S.C. 912(b), reading as follows:
For the purposes of this chapter, time spent in a travel status away from the official-duty station of any officer or employee shall be considered as hours of employment only when (1) within the days and hours of such officer’s or employee’s regularly scheduled administrative workweek, including regularly scheduled overtime hours, or (2) when the travel involves the performance of work while traveling or is carried out under arduous conditions.
Section 1939.5 (7) (d) of the Internal Bevenue Manual states that “rarely can time spent in travel status outside the regularly scheduled tours of duty be considered as overtime work.”
The record does not warrant the inclusion of hours of travel accomplished by any of the plaintiffs herein for purposes of allowing overtime pay provided by the Federal Employees Pay Act of 1945, 59 Stat. 295, as amended. It was an incident of the performance of duty, necessary and authorized, but the record here does not warrant inclusion of the hours of ordinary, normal travel as a basis of granting extra pay beyond the per diem allowed while away from official station.
6» Plaintiffs were required to cooperate with state, county, or municipal law-enforcement officials. This duty involved the cultivation of friendly liaison with such officials. Sometimes cases involving liquor violations, or a violation pertaining to firearms, would be initiated by an arrest by local law-enforcement officers on some charge involving a violation of state law or a municipal ordinance. Such cases are known in the Division as “adopted” cases.[2] Plaintiffs were under a duty to work on adopted cases, and expenses incurred in connection with such cases were considered proper and reimbursable. An incident of enforcement was the preparation of data as a basis for the assessment *188 of a Federal civil tax liability. This was true in adopted cases as well as in cases originating with Division investigators. Sometimes extensive investigative effort by plaintiffs would precede seizure by state officers. Ordinarily plaintiffs had to develop cases as to defendants after their seizure or arrest was made by state officers. In some instances plaintiffs were required to respond promptly on the basis of information received from local authorities in adopted cases regardless of the hour or the day of the week.
Plaintiffs also cooperated with other Federal law-enforcement agencies, such as the Federal Bureau of Investigation, Bureau of Narcotics, Secret Service, U.S. Game Wardens, and others.
7. Regional commissioners were authorized to prescribe modified workweeks for personnel under their jurisdiction, although their authority was subject to prescribed limitations.
Throughout the period involved in this litigation, the immediate office of the regional commissioner had a regularly prescribed administrative workweek of 40 hours, Monday through Friday, but plaintiffs herein were not required to strictly observe such hours. In the San Francisco Region the regular hours of duty were from 8 a.m. to 4:30 p.m., with a half hour for lunch. In the Omaha Region the hours of duty were from 8 a.m. to 4:45 p.m., with 45 minutes for lunch. Plaintiffs could vary their minimum work time of 8 hours on each of the days Monday through Friday when in an active-duty status, as the exigencies of their duties required. Under some circumstances, when plaintiffs worked late at night, they were permitted to commence work at a later hour on the following morning.[3]
8. In connection with the enactment of the 1954 amendments to the 1945 Federal Employees Pay Act, Senate Report No. 1992, July 28, 1954, stated, in part:
*189 Subparagraph (a) (2) of Sec. 401 of the New Title authorizes additional annual pay at rates up to 15 percent of the base pay rates, in lieu of other pay for irregular or unscheduled overtime duty, for employees whose hours of duty can not be controlled administratively and who are required to perform substantial amounts of irregular overtime and night and holiday duty, with the employee generally being responsible for recognizing without supervision, circumstances which require him to remain on duty. These employees would receive other overtime pay, computed in the usual manner, for regularly scheduled overtime work, officially ordered or approved. This paragraph is specifically directed at those investigators of criminal activities whose positions meet all the conditions specified.
On November 10, 1954, the Civil Service Commission promulgated a regulation (Sec. 25.263, Part 25 — Federal Employees Pay Regulations) pursuant to the above legislation, which stated, in part:
(a) By the nature of the work of such positions, “the hours of duty cannot be controlled administratively.”
One typical job situation in which the hours of duty cannot be controlled administratively: (i) The hours of duty of an investigator of criminal activities are governed by what criminals do and when they do it. lie is often required to perform such duties as shadowing suspects, working incognito among those under suspicion, searching for evidence, meeting informers, making arrests, and interviewing persons having knowledge of criminal or alleged criminal activities. His hours on duty and place of work depend on the behavior of the criminals or suspected criminals and cannot be controlled administratively.
(ii) In such a situation, hours of duty cannot be controlled by such administrative devices as hiring additional personnel; rescheduling the hours of duty (which can be done when, for example, a type of work occurs primarily at certain times of the day); or granting compensatory time off duty to offset overtime hours required.
(b) In order to satisfactorily discharge the duties of such positions, employees are required to perform substantial amounts of “irregular, unscheduled, overtime duty, and duty at night and on holidays.”
On May 11, 1955, the U.S. Treasury Department delegated authority to its various bureaus to make determinations con *190 cerning the payment of additional compensation on an annual basis to employees coming within the purview of the Civil Service regulations hereinabove referred to.
On June 28, 1955, the Treasury Department published a memorandum concerning premium pay for hours of overtime duty which cannot be controlled administratively, in part as follows:
[Section 4, paragraph .05] In accordance with Treasury policy [Personnel Circular No. 186, dated May 11, 1955), consideration of employees for eligibility to receive the premium pay authorized by this Mimeograph shall be confined to incumbents of positions in Class Series GS-1811. Furthermore, on the basis of the survey made in October 1954 only incumbents of the following _ positions in regional Alcohol and Tobacco Tax Divisions are likely to qualify for the premium pay:
Special Investigators Investigators
On March 26, 1957, the Treasury Department published a memorandum concerning premium pay for hours of overtime duty which cannot be controlled administratively, which stated, in part:
[Section 5, paragraph .02] In the Treasury Department, the positions in which the hours of duty cannot be controlled administratively are those of investigators of criminal activities, Class Series GS-1811 (Treasury Personnel Circular No. 186, May 11, 1955). On the basis of a survey made, it was found that in the Internal Revenue Service the positions of Special Investigator and Investigator in regional Alcohol and Tobacco Tax Divisions are the principal positions in which the hours of duty cannot be controlled administratively insofar as eligibility for 15 percent premium pay is concerned.
On or about May 15, 1952, the Alcohol and Tobacco Tax Division for the Omaha Region circulated a statement among its investigators which is quoted as follows:
Investigators are a mobile force and are subject to assignment to duty in any part of the United States. They are primarily engaged in suppressing the manufacture and distribution of distilled spirits on which the tax is not paid. Illicit distilleries are usually found in mountains and swampy areas, usually requiring searches on foot which frequently cover several miles. *191 Observation, over long periods of time, both day and night, of illicit distilleries is maintained at the distillery site, to apprehend the operators, regardless of weather conditions.
Other duties involve chasing vehicles transporting liquor in violation of Federal laws over rough roads at sustained high speed. Investigators are frequently exposed to ticks and other insects, and infrequently engaged in gun battles with violators. The position is classified by insurance companies as being a hazardous occupation.
Investigators are subject to duty twenty-four hours per day and often are on duty as much as eighteen hours.
Although this statement, in substance, reflects fairly accurately the status and responsibilities of plaintiffs in these claims during the period involved, the incidence of hardship and danger is less frequent than that experienced by investigators in some of the more populous regions of the United States.
In various other publications of the Treasury Department and the Civil Service Commission, the positions of criminal investigators in the Alcohol and Tobacco Tax Division are described as requiring work at irregular hours and considerable travel.
The evidence adduced in this case, including the position descriptions, shows that the plaintiffs were under a duty to work overtime if, in their discretion, existing circumstances required that they do so, regardless of the hour or the day of the week. They would have been derelict in their duties if they had arbitrarily decided to discontinue work at 4:30 p.m. under such circumstances.
The evidence establishes that, when the payment of premium pay of 15 percent to plaintiffs was discontinued, their position requirements remained the same: The administrative workweek was not shortened, the area for which they were responsible was not reduced, nor was there any increase in investigative personnel. Working conditions remained substantially the same throughout the period in litigation. Plaintiffs’ duty to exercise independent judgment with respect to the need to work overtime remained the same, and no difference occurred in the form of ordering *192 or approving overtime. Insofar as administrative control of the plaintiffs’ hours of duty was concerned, there was no difference between the period when the 15 percent premium was allowed and the period when it was not paid. Overtime work was performed whenever it was required or deemed necessary to complete an assignment or investigation. Payment of the 15 percent premium was never refused on the ground that the reported overtime work was not officially ordered or approved. The generally applicable policy of the Service not to authorize overtime work except to the extent that funds were available did not apply to enforcement personnel in the Alcohol and Tobacco Tax Division.
9. Plaintiffs in the San Francisco and Omaha Regions were ordered in writing and orally to perform overtime work.
• In its basic document pursuant to the 1954 amendments to the 1945 Federal Employees Pay Act, the U.S. Treasury Department provided:
[Section 4, paragraph .05] The extent of the non-taxpaid liquor traffic in any given area must necessarily be the basic factor in guiding supervisory officials in determining whether any officer who meets the individual qualifications can qualify for premium pay. Obviously, in many areas the volume or scope of the nontaxpaid liquor traffic is such as to not necessitate frequent, unscheduled overtime, consequently officers cannot qualify for premium pay. This does not, however, relieve the individual investigator of the obligation to answer the call of duty when the occasion demands.
In a memorandum dated September 23, 1955, prepared by the chief of enforcement, San Francisco Region, with the knowledge and approval of the assistant regional commissioner, the investigators and special investigators of the Alcohol and Tobacco Tax Division were informed:
* * * After September 30,1955, we will be operating in the same manner that we did before the instructions on overtime pay were issued, and it is expected that each of you will perform without extra compensation any overtime that may be necessary to make good cases and achieve effective results in our enforcement work.
On June 13, 1958, the assistant regional commissioner for *193 the San Francisco Begion addressed letters to supervisors-in-charge in which he stated, in part:
Most investigators by the very nature of their responsibilities must work irregular hours and perform many hours of overtime duty. * * *
The foregoing written statements reflect practices which pre-existed their respective dates, which applied throughout the period in litigation, and were considered by plaintiffs as orders for the performance of overtime work. Where the system of giving local assignments to investigators prevailed, they regarded such assignments as requiring them to proceed with the investigation and carry it through to completion, no matter what hours or days might be involved.
Paragraph 72(17)9, Chapter 7200, Part 7, Internal Bev-enue Manual, applicable during the period under consideration, provides:
Home address and telephone number — Each investigator will keep his supervisory officer notified of his home address and telephone number and will hold himself in readiness for duty when developments demand at all times.
Plaintiffs complied with this order and, accordingly, arranged for separate listings in the telephone books for the places of their residence which showed their official capacity under their home addresses so as to be accessible to persons who might telephone at hours or on days outside of the regular workweek.
On some occasions, supervisory officials directly ordered plaintiffs, orally and in writing, to perform overtime work. Plaintiffs worked overtime pursuant to such orders.
10. The Alcohol and Tobacco Tax Division has endeavored to stress the morale and esprit de corps factor among the criminal investigators. They were instructed to keep themselves in good health “because of long hours of duty, irregular meals and sleep, and assignments requiring exposure in bad weather, arduous duties, and stamina,” and that they must expect to give more time, attention, and effort to investigative duties than are required in many other professions. Plaintiffs were told that the public expects them to have *194 unquestioned integrity and to maintain a high standard of conduct.
While some supervisory officials meticulously refrained from specifically ordering the plaintiffs to perform overtime work, they frankly admitted the necessity, generally, for overtime work in order to get the job done, and expressed their “expectation” that the investigators would perform overtime work when it was considered necessary. Officials at the national office level shared this expectation.
Considerable pressure was brought to bear upon plaintiffs in this direction. It took the form of prospectively setting production quotas and standards, the presence of high-ranking supervisors on a regional and national level in situations and circumstances calling for the performance of overtime work, or maintaining high levels of production in circumstances pointing to the need of night work if the rate of production was to be maintained.
Plaintiffs were rated semiannually on efficiency and skill in the performance of their duties on the bases of quality and quantity of work performed. The national office set up criteria for rating, including promotion, demotion, and dismissal from service. Among the many factors listed as affecting the evaluation of an investigator’s ability and effectiveness were (1) attitude toward job and duties, (2) cooperation with supervisors, and (3) “willingness to devote extra time and effort to job.”
Complete information was available to the supervisory staff, including the national office, with respect to the performance of overtime work by the plaintiffs, through personal observation and official reports. The regional offices sent statistical reports to the national office showing, periodically, the hours of overtime worked by all investigators in the region. At no time during the years involved in this litigation were plaintiffs told that overtime was not necessary nor were they instructed not to perform overtime work. Many supervisory officials approved or acquiesced in the performance of overtime work by plaintiffs, but other officials who could have authorized or directed individuals or groups to perform overtime work failed to take the specific procedural steps which would have automatically set in *195 motion the procedure for payment of compensation for overtime work.
11. Some of the plaintiffs performed a substantial amount of unscheduled, irregular overtime work during the total period involved in this litigation. On various occasions they worked in excess of 40 hours per week, by performance of duties at night, on Saturday, Sunday, and on holidays.
The evidence is deemed adequate to establish that no administrative or procedural devices could have been employed to make it possible for plaintiffs to properly perform their duties without the performance of some overtime work. Supervisory officials could not determine in advance the nature of the activities which a particular investigation might entail, the place, or the time, the investigation might have to be performed. Consequently, plaintiffs were under a duty to exercise their discretion concerning the necessity and extent of overtime work required. Overtime was performed by the plaintiffs in assigned cases and in cases initiated by themselves when in their individual judgment it was necessary to effectively discharge their duties.
The necessity for overtime work in the San Francisco and Omaha Begions arose either from the volume of work which could not always be efficiently performed within the regular, administrative workweek, or from the practical impossibility of controlling the time when a particular task had to be carried out. The wide range of plaintiffs’ duties, the large territory assigned, the lack of clerical assistance, the large number of retail liquor outlets and firearms dealers to be checked by plaintiffs in their respective areas, the mailing of numerous notices, and the maintenance of detailed records, created a workload with which the individual plaintiff could not always cope in a 40-hour workweek.
Plaintiffs found it necessary to perform some of their functions at night, during weekends, or on holidays, because activities on the part of violators or suspects are not limited to a 40-hour workweek. The danger factor involved in the activities of criminal investigators was an element which rendered it difficult to plan enforcement activities on a routine basis. Additionally, the need to act expeditiously on information received and, generally, to take advantage of *196 favorable circumstances when they arose made it impossible for the plaintiffs to confine their activities to prescribed work hours.
One of the activities which, by its very nature, could not be accommodated to a rigid workweek was surveillance, which depended almost entirely on factors outside the investigator’s control and which had to 'be carried out at all hours, any day of the week, sometimes around the clock. The same is true of undercover work.
The time for conducting raids and searches was greatly influenced or controlled by such factors as the presence of the violators or suspects or incriminating evidence on the premises, and also the possible danger involved. The time for serving search warrants, or for seizure of contraband could not generally be controlled by plaintiffs. Sometimes the interrogation of witnesses or suspects, the taking of statements or fingerprints, had to be done outside the normal workweek. Usually, plaintiffs had to accommodate themselves to the wishes of informers as to the time and place of meeting, and many of those contacts would occur at night. Plaintiffs received telephone calls from informers at their homes during the evening hours and on weekends, and, on occasion, were required to act immediately upon the information furnished them.
Many of the duties which plaintiffs had to perform were of a character which, generally, rendered them susceptible of performance routinely within the regularly prescribed workweek. Inspection of warehouses and wholesale establishments dealing in containers or materials used in the production and distribution of alcoholic beverages involving the examination of records in connection with the control of raw materials could normally be carried out between the hours of 8 a.m. and 4:30 p.m. This is also true, subject to some exceptions insofar as investigations in connection with petition cases or home wine control cases are concerned. Some of the duties relating to the retail-liquor-dealer control program could likewise be performed as part of the daily routine.
The retail-liquor-dealer program was formerly in charge of special inspectors. In 1954, the position of special inspector *197 was abolished, and the duties previously performed by the inspectors were assigned to the criminal investigators. Henceforth the term “inspections” was used for routine checkups of retail-liquor establishments. “Investigations” with respect to retail liquor dealers were of broader scope, not confined to a mere checkup or the collecting of a tax, but involving additional duties, such as checking the state license for the purpose of determining true ownership; examining samples of liquor to ascertain that brands had not been changed, bottles refilled, or liquor watered down or mixed with nontaxpaid liquor. In this connection, plaintiffs performed chemical tests known as the Williams tests. Retail-liquor-dealer inspection also included the collection of delinquent occupational taxes in substantial amounts from legitimate dealers as well as from unlicensed persons who operated and sold from private homes or automobiles.
Retail-liquor-dealer inspection also included the checking of records of purchase which are required to be kept for 2 years, determining whether these represented all of the purchases made as well as their sources, dates, and quantities. Retail inspections also required that the investigator gain the confidence of the owner or the manager with a view to obtaining leads to stills or other liquor violations. Willful violations in this area of enforcement are felonies, and it was plaintiffs’ duty to assist in establishing criminal cases when such were warranted by the facts and circumstances developed by investigation. Performance of these duties pertaining to a large number of retail establishments necessarily involved some overtime work either because some of them would not be open for business during the daytime hours or because of the absence of the owner or manager from the premises. Depending upon varying facts and circumstances, a retail dealer inspection would require anywhere from 5 minutes to an hour, and possibly several hours, over a period of time.
The weekly average for each man ranged from no overtime to as many as 40 hours. Had plaintiffs confined themselves to a rigid 40-hour week, there would have been occasions when they would have been derelict in the performance of their duties; the enforcement program of the Alcohol and *198 Tobacco Tax Division and the collection of revenue could have been greatly impaired; and plaintiffs’ services would have been less effective.
12. As part of their official duties plaintiffs were required to prepare and file many records and reports to make it possible for appropriate action to be taken by those who made final decisions. Included among the reports required were those concerning progress of local investigations; reports concerning possible law violations and the need for investigations ; short case reports which were not given case numbers; inspection reports; and reports in connection with maintenance and repair of automobiles used in their work.
The basic report was the Daily Report of Activities in which the plaintiffs were required to record the performance of duties, including all hours of irregular, unscheduled overtime duty, chronologically, by the hour, stating the nature of the duty, identifying the persons and places involved, and indicating the reason for the action taken. If overtime work was performed on any given day, the plaintiffs were required to report such work in the same manner as they reported the work performed during regular hours on that day, and to indicate facts showing why the overtime work was necessary or desirable under the circumstances. Sometimes a memorandum was attached to the daily report, when a more detailed explanation was deemed necessary.
In addition to recording expenses incurred in connection with the use of Government automobiles, plaintiffs were required to report hotel expenses, long distance telephone calls, the cost of such items as food, drink, or gasoline purchased for use by informers; cost of purchases to be used as evidence, and costs incidental to the use and replacement of equipment such as films, batteries, or flashlights, for which reimbursement was claimed. A special section of the daily report was for the purpose of reporting and claiming per diem allowances in connection with activities performed away from the plaintiffs’ usual posts of duty. No distinction was made in reporting these expenditures as to whether they were incurred in activities performed during regular, prescribed, administrative workweeks, or in connection with work done at night, on Saturdays, Sundays, or legal holi *199 days. Plaintiffs were consistently reimbursed for these expenses, and were paid per diem allowances in connection with the overtime work involved.
The daily reports were prepared on the basis of contemporaneous memoranda, collectively referred to as “diaries”,[4] which the plaintiffs were required to keep as a basis for the preparation of the daily reports. While the requirement for these diaries during part of the period appears in the Internal Eevenue Manual, it does not prescribe their f orm or scope, nor does it provide for their filing with any supervisory officials, or examination by them. The form and scope of the diaries varied among the plaintiffs. Notes contemporaneous with activities would sometimes be written in little books purchased by the plaintiffs at their expense, or on the backs of envelopes. These notes were sometimes detailed, but frequently very brief, covering a multiplicity of activities in one short entry. There was no requirement for their retention for any length of time and the plaintiffs would destroy or discard them at will after the filing of daily reports based thereon. There is no evidence that supervisory personnel were concerned with the content of such notes until they were transferred to daily reports.
Plaintiffs were required to file the original and a copy of the daily report with their immediate supervisor as soon as practicable after each workday, usually the next morning. The immediate supervisor had the duty to verify that the plaintiffs had performed the duties shown on the report. Each form of the daily report contained an entry marked: “Approved, Immediate Supervisor.” The immediate supervisor would indicate his agreement by signing the form below the printed word “Approved”, unless there was some irregularity, in which event he would call upon the particular employee for an explanation, or make the appropriate correction in the report. The immediate supervisor would forward the report to the supervisor-in-charge at the branch office who, in turn, would send it on for filing with the assistant regional commissioner.
At the end of each calendar month the plaintiffs were required to file a monthly report, on the prescribed form, on *200 which was shown the distribution of time between various activities involved such as control of illicit liquor, retail-liquor-dealer inspections, and enforcement activities in connection with various laws for the control of traffic in firearms. Pursuant to the regulations governing the 15 percent premium pay as additional compensation for all overtime under the 1954 amendments to the 1945 Federal Employees Pay Act, there was a requirement for the ñling of quarterly reports setting forth the overtime which, under the regulations, qualified for the premium pay. These reports were prepared on the basis of the daily reports. The quarterly as well as the monthly reports, and other time-and-attendance reports, required separate entries concerning overtime work performed by plaintiffs. Some of the official reports assign a role to the chief, enforcement branch of the region, in connection with reported overtime work.
False reporting of overtime could have subjected plaintiffs to criminal prosecution and constituted grounds for dismissing them from the Service. The daily reports introduced in evidence reflect the approval of the immediate supervisor. Approval of the daily reports was, in effect, an approval of the overtime activities recorded in the reports as well as the other activities carried on during regular tours of duty. The evidence is accepted as sufficient to establish that the plaintiffs and their supervisory officials in the Alcohol and Tobacco Tax Division were men of integrity and reliability; that the supervisors-in-charge were in touch with the plaintiffs through personal contact, mail, or telephone; that they had means of checking on the accuracy of the entries concerning reported overtime work if they had reason for inquiring into the matter, and that they did check the daily reports for accuracy.
The position descriptions of the supervisors-in-charge impose upon them the duty of continually evaluating enforcement operations in their respective areas, including data recorded in the daily reports. They were required to report to the assistant regional commissioner on workloads, and to consult with, and advise the assistant regional commissioner on enforcement problems. Additionally, the Inspection Service of the Treasury Department had authority to con *201 duct personnel investigations and to carry out audits in the Alcohol and Tobacco Tax Division for the purpose of determining whether the investigators were performing their work in conformity with the Internal Revenue Manual.[5]
The national office of the Alcohol and Tobacco Tax Division in the Treasury Department specifically directed that the daily reports be regarded as the basis upon which the regional officials were to make determinations with respect to the qualification of the plaintiffs to obtain the 15 percent premium pay in lieu of additional compensation for overtime work, pursuant to the 1954 amendments to the 1945 pay act. That office likewise recognized the lowest level supervisory official of an individual employee as the person “who can most properly evaluate the requirements of the employee’s position having a bearing upon the determination of eligibility, who can attest to the hours of overtime, night and holiday duty performed by the employee in the past and who can anticipate on a definite basis the number and frequency of hours of such duty to be required in the future”. Accordingly, the following statement was made in a memorandum of March 26, 1957, Section 6, paragraph .04:
* * * the supervisor has prime responsibility for appraising whether or not the performance of overtime work in all instances is essential to the effective execution of the enforcement program in the local area and hence necessary to the effective discharge of duties in the case of any given employee.
Administrative action was, in fact, taken on the basis of the daily reports, directly or on the basis of data in the daily reports as incorporated in monthly or quarterly reports. For certain periods within the time involved in this litigation some plaintiffs did receive the statutory 15 percent of their basic salaries, or were given time off as additional compensation for overtime work. The determination of entitlement to such additional compensation was based on the amount of *202 overtime shown in the official reports. Additionally, plaintiffs were paid or reimbursed for expenses incurred in connection with duties performed during hours or days outside of their regular, prescribed administrative workweek, and were allowed per diem payments on the basis of entries made in their daily reports and approved by their immediate supervisors.
13. The director of the Alcohol and Tobacco Tax Division testified, in effect, that the overtime provisions of the 1945 Federal Employees Pay Act were never applied to the criminal investigators in the Division who worked substantial overtime because “there was very little in the way of funds available.” At the same time, it was the concern of responsible officials in both the national and regional offices “to get the work done, to get the cases made, as many and as fast and as well as possible, [a]nd insofar as it is necessary to work more than eight hours a day * * *,” These officials were fully aware that effective enforcement of the liquor and firearms laws required that the investigators work overtime and that they did, on many occasions, work more than 40 hours per week.
In providing for additional compensation for criminal investigators on an annual basis in lieu of all other forms of statutory premium pay, Congress made the application of this authority discretionary with the administrative officers concerned, at the same time making it clear that, in the event of nonexercise of the authority, additional compensation, as provided in the 1945 pay act, was to be paid. Congress also vested authority in the heads of departments and administrative agencies in their discretion to pay less than 15 percent of base pay on an annual basis.
The Treasury Department delegated authority to heads of bureaus of the Treasury Department (which included the Commissioner of Internal Revenue) to' take appropriate steps for the application of the 15 percent annual premium pay provisions to criminal investigators. On June 28, 1955, the Treasury Department published a memorandum setting forth rules concerning determination of eligibility to receive premium pay.
These rules provided, in substance, that to establish such eligibility a criminal investigator must have an average of at *203 least 6 hours of overtime duty per week; that it must appear from available records that overtime to this extent was required of the investigator during the prior 12 months, and that a definite basis exists for anticipating that such overtime will be performed during the next 3 months. An additional condition for eligibility required that irregular unscheduled overtime duty occur more than once a week. It provided that the extent of the nontaxpaid liquor traffic in any given area must necessarily be the basic factor in guiding supervisory officials in determining whether any officer who meets the individual qualifications can qualify for premium pay, but made it clear that a relatively low volume or scope of non-taxpaid liquor traffic “does not, however, relieve the individual investigator of the obligation to answer the call of duty when the occasion demands.”
Pursuant to this memorandum, the San Francisco and Omaha Begions paid additional compensation equal to 15 percent of base pay to those of their investigators who met its requirements, including the minimum of 6 hours of overtime work per week, and normal overtime compensation of one and a half times the hourly rate to those investigators who did not qualify for the 15 percent of annual base pay, without reference to any preordering in writing of overtime work. These payments were discontinued after a period of 3 months, on September 30,1955, upon the insistence of the national office that these regions were not faced with a critical liquor problem. In the San Francisco Begion, a request for a written instruction to tins effect was denied.
Under date of April 15,1958, the chief of the enforcement branch, San Francisco Begion, addressed a letter to the assistant regional commissioner which included, among others, the following paragraphs:
The necessary duties of Investigators in the large geographical area of this Begion cannot be properly performed by an investigative force of 54 men without a very considerable amount of overtime. If attrition reduces the force below 54 the necessity for overtime will be correspondingly increased. An Investigator without informers is only partially effective. Informers must be met at their convenience, often at night and on short notice. We do not have enough Investigators *204 at any post of duty to permit us the luxury of specialized squads or staggered shifts.
In an area where stills are small and widely dispersed it is often necessary to run out as many as a dozen false leads to get one still. Just as much careful surveillance and tailing is required to eliminate a false lead as is required to make a good seizure. Sometimes it actually takes longer to run out a poor lead or inaccurate information than would be required to catch an operating still. It is frequently necessary to work back from meager information such as a report that illicit liquor has appeared in some small town as evidenced by the fact that the police are picking up drunks in possession of partly filled bottles of moonshine whiskey.
We lead all Regions in eases made under the National and Federal Firearms Acts because we have carefully developed cooperation from local law enforcement agencies and because they know that they can depend on us to answer calls at any hour of the day or night. Failure to do so would quickly cost us such cooperation. We also receive excellent cooperation from the Immigration Service in connection with the smuggling of liquor across the Mexican border for the reason that they know we will respond promptly at any hour to assist them and to adopt such seizures.
Our very high mandatory R.L.D. Inspection quota consumes a disproportionate amount of Investigator’s time which makes overtime necessary if illicit liquor and firearms cases are also to be made. It is absurd to say that an Investigator performs overtime “for his own convenience.” He does so for the benefit of the Government and for reasons of professional pride in his career well knowing that longer hours are an occupational hazard. Any Investigator would prefer to be at home with his family outside of regular business hours rather than remain on a stakeout often under very uncomfortable conditions. At 3:00 a.m., Investigators get just as sleepy as auditors or anyone else.
We had no problem with regard to working overtime until premium pay became a matter of law, after which it was decided arbitrarily that such overtime would be paid on a geographical basis rather than as a result of necessary duties performed. For many years Investi-gatore have understood that they may not temporarily lay aside their official status after 4:30 p.m., and that in effect they are on duty 24 hours every day insofar as violations coming to their attention are concerned. Failure to pay premium overtime has created a major *205 morale problem in this Begion, particularly in view of the fact that all other Federal Law Enforcement Agencies receive it as a matter of course.
The word is rapidly spreading that we are a second class outfit, without overtime, and cursed with lagging grades, inferior automobile and technical equipment, a lesser rate of per diem, etc. As such information reaches undergraduates of Police Science schools and other sources of manpower our recruitment of good Investigator material appears to be seriously threatened. In the meantime young Investigators are beginning to seek transfers to other Law Enforcement Agencies where pay and working conditions are superior to ours. We have already lost four such men in the recent past and will no doubt lose more in the near future if conditions continue as they are.
If we are only permitted to pay overtime to ten or fifteen Investigators and the rest are instructed not to perform overtime (as suggested by the Assistant Commissioner in his letter) the effective size of our force will be cut to those receiving the overtime. An Investigator who fails to perform necessary overtime is practically worthless.
Upon consultation with the assistant regional commissioner, and upon instruction of the chief of enforcement in the national office, the chief of enforcement for the San Francisco Begion addressed a memorandum to the investigators dated September 23, 1955, informing them of the termination of the 15 percent annual premium pay, concluding with the statement:
* * * and it is expected that each of you will perform without extra compensation any overtime that may be necessary to make good cases and achieve effective results in our enforcement work.
On March 26, 1957, the Treasury Department published a memorandum, relative to the payment of additional compensation for overtime duty which could not be controlled administratively, which did not contain the qualifying factor of the existence of a serious nontaxpaid-liquor-traffic problem in order to establish individual eligibility for premium pay. Upon assurance by the national office that premium pay would now be resumed to otherwise qualified investigators in the San Francisco Region, and after the *206 preparation of appropriate records establishing such qualification for most investigators in the region, the national office struck from its proposed request for appropriations the sum which it had estimated would be required to meet this added obligation. Requests and recommendations for the payment of overtime work and considerable correspondence between the regional and national offices, notwithstanding, no additional cash compensation on an annual or straight-overtime-rate basis was resumed in the San Francisco Region. At no time was payment refused because work was not ordered or approved. The assistant regional commissioner, in statements dated June 13, 1958, to supervisors-in-charge, affirmed this as his policy, in the following language:
Most investigators by the very nature of their responsibilities must work irregular hours and perform many hours of overtime duty. Aside from the policy of paying premium pay which we are trying to get approved, 'because of the limited funds available it will be the policy of this office to look with disfavor upon any request from investigators for paid overtime or compensatory time off under Sections 1939.5 and 1939.6 of the Internal Bevenue'Manual. * * *
In connection with the study given this problem, a number of proposals were considered, such as (1) creation of special squads, (2) the substitution of a flexible administrative workweek for the then existing 8:00 a.m. to 4:30 p.m., 5-day week schedule, and (3) the payment of additional compensation to 10 or 12 of the investigators in the area. The inadequate manpower[6] and administrative restrictions rendered the first two proposals unacceptable or inapplicable. The difficulty entailed in selecting men for preferential treatment and the morale problem which such discrimination would entail resulted in failure to effectuate the third proposal. In the exchange of communications between the national office and the San Francisco office there was no instruction or suggestion that investigators be told to discontinue overtime work.
The policy of denying compensatory time in lieu of paid overtime was abrogated in the San Francisco Begion effec *207 tive July 12, 1959, when those investigators who elected to request such form of compensation were granted the right to do so. The granting of compensatory time was not made conditional upon any advance ordering or specific approval of overtime work. This arrangement was made possible at the expense of reducing some of the activities previously expected from the plaintiffs.
In the Omaha Region additional compensation on a 15 percent basis annually was started in July 1955, with respect to those who met all the qualifications prescribed in the memorandum. No additional compensation was paid to those who could only prove overtime work of less than 6 hours per week or to those who did not meet some other technical requirement of the memorandum. Payment for overtime work was never denied because the work was not specifically ordered or approved. Apparently no compensatory time off was requested by investigators or offered to them in lieu of paid overtime in the Omaha Region. The assistant regional commissioner, Alcohol and Tobacco Tax Division, had authority to grant it and delegated such authority to supervisors.
The overtime situation in the Omaha Region was aggravated by virtue of the special enforcement responsibility under the Liquor Enforcement Act of 1936, which is concerned with the prevention of illegal importation of liquor into dry states. Alcoholic beverages could not legally be imported into the state of Kansas prior to the year 1948, nor into the state of Oklahoma prior to May 1959.
Joplin, Missouri (in the Omaha Region), was a center from which great quantities of liquor were transported into Oklahoma; and, since 1955, concentrated enforcement drives against this illegal traffic required around-the-clock surveillance of wholesale and retail outlets and of transportation routes. These drives lasted from 10 days to 2 weeks each, including Saturdays, Sundays, and holidays. The regional office determined the period for carrying out such drives upon consultation with district supervisors. As a rule, investigators from remote posts of duty would be detailed to participate in such drives, but they were not given any additional compensation, since (1) they did not perform a *208 minimum of 6 hours of overtime work per week or (2) because they did not perform the required average number of hours per week during the preceding quarter.
The overtime situation in the Omaha Region was a subject of discussion among regional and district Division officials, and officials of the national office sometimes participated in these discussions. These meetings were conducted every 3 or 4 months in one of the branch offices of the Omaha Region. At such a meeting in Oklahoma City in February 1959, investigators were instructed to report currently by telephone, at any time, information concerning the Joplin Missouri situation. In Wichita, Kansas, a man was assigned to a telephone 24 hours a day. Payment for overtime work was discussed at a meeting in Joplin in June 1958, at which time it was agreed, in principle, that pay for overtime work performed by investigators should be allowed. Plaintiffs were led to believe that additional compensation would be paid. While performance of overtime activities by investigators was admitted and planned at such meetings, statements were also made that no one was ordered in writing to perform overtime work. A statement was made at one of the meetings referred to herein, at which the branch chief for enforcement (Omaha) presided, to the effect that investigators could not be compelled to work overtime without additional compensation, but they could be made to wish they had done so.
14. The Federal Employees Pay Act of 1945, 59 Stat. 295, 296, provides, in part, at section 201:
m Officers and employees to whom this title applies shall, . addition to their basic compensation, be compensated for all hours of employment, officially ordered or approved, in excess of forty hours in any administrative workweek, at overtime rates as follows.
It appears that plaintiffs herein come within the purview of the above-quoted section of that Federal statute.
Section 401(2), Amendments to the Federal Employees Pay Act of 1945, as amended, 68 Stat. 1109, 1111, requires the head of any department, independent establishment, or agency to provide for premium compensation on an annual basis not to. exceed 15 percent of basic compensation, *209 to any officer or employee in a position in which the hours of duty cannot be controlled administratively and which requires substantial amounts of irregular, unscheduled overtime duty at night and on holidays, with the officer or employee being responsible for recognizing, without supervision, circumstances which require him to remain on duty. Congress declared the foregoing statute to be specifically applicable to criminal investigators (see finding 8 herein),
Section 202(a) of the 1954 amendments to the 1945 pay act provides as follows (68 Stat. 1109):
The head of any department, independent establishment, or agency, including Government-owned or controlled corporations, or of the municipal government of the District of Columbia, or the head of any legislative or judicial agency to which this title applies, (1) may, at the request of any officer or employee, grant such officer or employee compensatory time off from his scheduled tour of duty in lieu of payment for an equal amount of time spent in irregular or occasional overtime work, and (2) may, at his own discretion, provide that any officer or employee, whose rate of basic compensation is in excess of the maximum scheduled rate of basic compensation provided for grade GS-9 in the Classification Act of 1949, as amended, shall be compensated for irregular or occasional overtime work for which compensation would be due under this Act with an equal amount of compensatory time off from his scheduled tour of duty in lieu of such compensation.
Section 204 of the 1954 amendments to the 1945 pay act provides (68 Stat. 1110; 5 U.S.C. 912 (b)) :
For the purposes of this Act, time spent in a travel status away from the official-duty station of any officer or employee shall be considered as hours of employment only when (1) within the days and hours of such officer’s or employee’s regularly scheduled administrative workweek, including regularly scheduled overtime hours, or (2) when the travel involves the performance of work while traveling or is carried out under arduous conditions.
Section 604(a) (2) of the 1954 amendments to the 1945 pay act provides (68 Stat. 1112) :
Except where the head of each such department, establishment, or agency and of the municipal government *210 of the District of Columbia determines that his organization would be seriously handicapped in carrying out its functions or that costs would be substantially increased, he shall provide, with respect to all officers and employees in his organization, (A) that assignments to tours of duty shall be scheduled in advance over periods of not less than one week, (B) that the basic forty-hour workweek shall be scheduled on five days, which shall be Monday through Friday wherever possible, and the two days outside the basic workweek shall be consecutive, (C) that the working hours in each day in the basic workweek shall be the same, (D) that the basic non-overtime workday shall not exceed eight hours, (E) that the occurrence of holidays shall not affect the designation of the basic workweek, and (F) that breaks in working hours of more than one hour shall not be scheduled in any basic workday.
Pertinent Civil Service regulations are as follows:
Sec. 25.212[1] Establishment of work schedules. Except where he determines that the department would be seriously handicapped in carrying out its functions or that costs would be substantially increased, the head of each department shall provide that (a) assignments to tours of duty shall be scheduled in advance over periods of not less than 1 week, (b) the basic 40-hour workweek shall be scheduled on 5 days, which shall be Monday through Friday wherever possible, and the 2 days outside the basic workweek shall be consecutive, (c) the working hours in each day in the basic workweek shall be the same, (d) the basic nonovertime workday shall not exceed 8 hours, (e) the occurrence of holidays shall not affect the designation of the basic workweek, and (f) breaks in working hours of more than 1 hour shall not be scheduled in any basic workday. *****
Sec. 25.222 Computation of overtime employment. The computation of the amount of overtime employment of an officer or employee shall be subject to the following conditions:
❖ # * ❖ *
(e)[1] Time in travel status. Time in travel status away from the official duty-station of any officer or employee shall be considered as hours of employment only (1) when within the days and hours of his regularly scheduled administrative workweek, including *211 regularly scheduled overtime hours, or (2) when the travel involves the performance of actual work while traveling or is carried out under such arduous and unusual conditions that the travel is inseparable from work.
H* ❖ H* H*
Sec. 25.223[1] Computation of overtime compensation. (a) For each officer or employee whose basic compensation is at a rate which does not exceed the minimum scheduled rate of grade GS-9 of the Classification Act of 1949, as amended, the overtime hourly rate shall be one and one-half times his hourly rate of basic compensation.
(b) For each officer or employee whose basic compensation is at a rate which exceeds the minimum scheduled rate of grade GS-9 of the Classification Act of 1949, as amended, the overtime hourly rate shall be one and one-half times the hourly rate of basic compensation at the minimum scheduled rate of grade GS-9.
* $ * :U %
Sec. 25.224 Compensatory time off for irregular or occasional overtime duty, (a) The head of a department may, at the request of any officer or employee, grant such officer or employee compensatory time off from his scheduled tour of duty in lieu of payment under section 25.223 for an equal amount of time spent in irregular or occasional overtime work.
(b) The head of a department may, at his own discretion, provide that any officer or employee whose rate of basic compensation is in excess of the maximum scheduled rate of grade GS-9 of the Classification Act of 1949, as amended, shall be compensated for irregular or occasional overtime work with an equivalent number of hours of compensatory time off duty, in lieu of payment under section 25.223.
(c) The head of a department may fix a time limit within which compensatory time off may be requested or taken, and may provide that when an officer or employee is entitled to compensatory time off under paragraph (a) or (b) of this section but fails to take it within the prescribed limit, he shall lose his rights both to compensatory time off and to overtime pay unless the failure is due to an exigency of the service beyond his control.[1]
See footnote 1 on page 210.
*212 Sec. 25.264 Bates of additional compensation payable v/nder section %5.%61.
*****
(b) If any such department or other agency wishes to pay additional compensation under section 25.261 to an employee in a position meeting the requirements of section 401(2) of the Federal Employees Pay Act of 1945, as amended, and these regulations, and if unusual conditions are present which seem to make the approved rate in paragraph (a) of this section unsuitable, the department or other agency should propose a lesser rate of additional compensation for the Commission’s approval. The proposal should include full information bearing on the frequency and duration of irregular, unscheduled, overtime duty and the night and holiday duty required; the nature of the work which prevents hours of duty from being controlled administratively; the necessity for the employee’s being generally responsible for recognizing, without supervision, circumstances which require him to remain on duty; and any other pertinent conditions.
* ^ ^ * *
Sec. 25.272 Payment provisions. * * *
(d) During periods when an employee is not entitled to receive additional compensation under section 25.251 or section 25.261, he shall be paid for overtime, night, and holiday duty in accordance with other sections of this subpart.
internal revenue regulations
1939.4 Policies Governing Tours of Duty
(1) Normal Tours of Duty. The regular basic workweek throughout the Service will consist of five consecutive 8-hour workdays, Monday through Friday, in each administrative workweek. The National Office (Attention 0: Ad: O: A) will be kept informed by the appropriate ARC (Administration) of the usual official hours of duty in effect in the offices of the Regional Commissioners and District Directors and in Service Centers, Regional Counsel will keep the National Office informed of their usual official hours of duty in accordance with procedures established by the Chief Counsel. Regional Inspectors will keep the National Office informed of their usual official hours of duty by forwarding reports thereon to the Assistant Commissioner (Inspection), who in turn will route a copy of each report to C: Ad: O: A. The information furnished with *213 respect to hours of duty shall specify the time zone and, whether daylight saving time is in effect and, if so, when it goes into effect and out of effect. 'It is not necessary to include hours for irregular or unusual tours of duty. Report -Symbol hTo. C: Ad: O: A: 39 has been assigned.
(2) Changes From Normad Tours of Duty. When an authorized official identified in subsection 1939.3 above, determines that the organization would be seriously handicapped in carrying out its functions or that costs would be substantially increased by adherence to the regular basic workweek, tours of duty may be scheduled to include hours of duty on Saturdays and 'Sundays or during one or more evenings a week, or both; and on fewer than five days but not more than six days of the administrative workweek. Deviations from the normal tour of duty will be held to a minimum, to meet situations such as to the following:
(a) The unusual work requirements created by filing periods;
(b) The extended assignments of special agents to assist United States Attorneys in preparation for trial;
(c) The performance of investigative work in the evening or night hours on a regularly scheduled basis;
(d) The examination of books of taxpayers when such examination cannot be made during normal business hours;
(e) The assignment of Revenue Officers to the canvassing of night clubs and cabarets; or
(■f) Storekeeper-Gauger assigned to a plant where working hours differ from the normal tour of duty.
(3) Scheduling• Work Hours and Workdays. If feasible, tours differing from the normal basic workweek should provide 'for the same hours of work for each day, and for two consecutive days off in each administrative workweek. Written notification clearly identifying the work hours and workdays will be given to all affected employees and the necessity for the irregular tour explained by a responsible official. Employees who have religious convictions against working on Saturday should be assigned tours of duty with Saturday as their day off, if practicable.
(4) Notice to Employees of Tours of Duty. All tours of duty established by authorizing officials will be announced in written notices identifying the calendar days *214 and the hours of each day comprising each tour. Every employee affected by such a notice should be given a copy thereof at least one pay period in advance of the first pay period covered by the notice. In the event that unusual circumstances render such early notification impracticable this provision may be relaxed, but the notice must be delivered to the affected employees no later than the beginning of business on the first day of the tour of duty covered therein. Written notification of changes in tours will ordinarily be given to employees in the same manner.
(8) Night Duty. Night duty will foe kept to a minimum. Where circumstances make it necessary, however, night duty may be required. Compensation for regularly scheduled duty between the hours of 6:00 P.M. and 6:00 A.M. will be made in accordance with existing night differential regulations. Chapter Zl, Part 25, of the Federal Personnel Manual contains detailed instructions concerning the payment of night differential to employees governed by the Federal Employees Pay Regulations and for “ungraded” positions. (See applicable Treasury Decisions on Wage Board.)
$ $ $ $ $
1939.5 Overtime Duty
$ ^
(4) General Policy Regarding Overtime WorJc. Officials authorized to order or approve overtime work will be guided by the general policy of the Service that overtime, whether on a paid or compensatory time-off basis, shall be approved only when overtime work is necessary to accomplish work that cannot be deferred, to eliminate backlogs, or to prevent further accumulation of work emergency situations. Any overtime not authorized or approved in writing will be considered as on a voluntary basis and will not be compensated by pay or compensatory time off. However, no request, direct or indirect, express or implied, will be made of any employee for voluntary overtime duty for which pay or compensatory time off will not be granted. A supervisor’s ordering overtime duty orally or requesting the performance of work outside of regular tours of duty on a voluntary basis directly or indirectly by implying that employees not “volunteering” will be in disfavor, cannot and shall not be condoned. Practices of this kind, which may be justified in the mind of the supervisor as being *215 in the interest of the Service, are in direct conflict with Service policy and the intent of law.
(5) Irregular, Unscheduled, Overtime Duty. The policy, regulations and instructions relative to the payment of additional compensation to employees occupying positions in which the hours of duty cannot be controlled administratively and which require overtime, night, and holiday duty is set forth in Manual Supplement 19G-4 (recoded from IR-Mimeograph No. 57-39).
$ $ # $ $
(7) What Constitutes Overtime Work
(a) Overtime work comprises those hours of duty performed by an employee outside of his basic 40-hour workweek (his scheduled regular tour of duty) as may be required of him to discharge effectively the duties of his position. “Required” may mean ordered by the employee’s supervisor or a recognition by the employee that overtime duty is necessary to the effective carrying out of a task, an assignment, or a program. In the latter case, if the overtime duty was performed by an employee without being ordered, his supervisor is responsible for approving the overtime duty for determining whether or not the extra hours of work were necessary to the effective discharge of duties and program responsibilities.
$ * $ $ $
1939.6 Compensatory Time
(1) General
❖ * * * *
(c) Under Section 202(a) of the Federal Employees’ Pay Act of 1945, as amended by Public Law 763, 83rd Congress, per annum employees whose salaries are at or below the maximum scheduled step rate of Grade GS-9 have the right to elect either overtime pay or compensatory time off for irregular overtime duty. Section 202 (a), however, permits approving officials to require employees whose salaries exceed the maximum scheduled step rate of Grade GS-9 to take compensatory time off in lieu of overtime pay for irregular overtime duty.
(2) Policy
(a) The Service will not order overtime duty for employees who have the right to elect either overtime pay or compensatory time off (see subsection 1939.6: (1) (c)) when funds are not available to pay for such services unless the employee voluntarily chooses to perform overtime on a compensatory time-off basis. This right of *216 election will be exercised by these employees prior to the actual performance of overtime duty. When the performance of overtime is desirable but funds are not available, supervisors may explain to employees who have the right to elect compensatory time off the need for work and the inability to pay for overtime so the employees may make their own decision. Such explanations should in no way attempt to influence an em-ee’s decision.
) When funds are not available and their overtime services are required, employees whose salaries exceed the maximum scheduled step rate of Grade GS-9 may be required to take such compensatory time off in lieu of overtime pay.
![! « * * *
(4) Requirements for Granting Compensatory Time Off
(a) Compensatory time off in lieu of payment of overtime worked may be granted to eligible employees (identified in Subsection 1939.6 :(1) (a) above) under the following conditions:
(1) The overtime work must have been ordered or approved in writing by the approving official and must have been irregular duty in excess of the regularly scheduled tour of duty of 40 hours each basic workweek.
❖ ❖ ❖ ❖ ❖
(5) Scheduling and Use of Compensatory Time Off From Duty
Officials authorized to approve irregular overtime duty will be responsible for scheduling the employee to take compensatory time off from duty. Generally the time off should be scheduled for such periods of time most suitable to the employee without detriment to the interests of the Service. Accumulations of compensatory time for irregular overtime duty will be kept to an absolute minimum; the maximum accumulation of compensatory time to an employee’s credit normally should not exceed 80 hours at any time. Compensatory time off from duty normally should be scheduled as soon as Sossible after it is earned, but not later than 120 calendar ays from the date it was earned. In any case, however, in which the accumulation of compensatory time cannot be limited to 80 hours for reasons beyond the control of the responsible supervisor or official, or an employee is prevented from taking his compensatory time off within *217 120 days because of an action of tlie Internal Bevenue Service beyond the employee’s control, the employee should be paid at the applicable overtime rate for any unused compensatory time if funds are available. If funds are not available, authority to extend the above limitations may be requested from the Director, Personnel Division, National Office. An exception to the foregoing limitations will be made in the case of an employee on an extended special assignment which makes the scheduling and use of compensatory time within the time limits impracticable. If funds are not available to pay such employees, the compensatory time should be scheduled and used as soon as practicable within the extension following the termination of the special assignment.
15. In addition to witnesses utilized by counsel for plaintiffs counsel for defendant called four plaintiffs as witnesses, namely, John H. Cosgriff, Jack A. Blue, Kenneth H. Lyng-holm, and Cyrus B. Sandberg.[7] Those plaintiffs testified in considerable detail concerning the nature and scope of the work which they performed. Some records reflecting work performed by these investigators, including overtime performed at night or on days not encompassed by the administrative workweek, were also placed in evidence. No computations with respect to the number of hours spent working overtime or reflecting the amount claimed by each of these plaintiffs have been submitted in their behalf. A determination of the amount of recovery in these claims, if any, and the other claims in the same category must necessarily await liability involved:' also be made.
The official reeords is evidence shew that eaeh ef the plaintiffs whose names appear below worked evortimo hears at night; en ^Sundays? and he-lidays fer various time intervals within the period involved in this litigation fer whieh they have net heen eempensatedr Ne hears spent in a travel status and elaimcd an evortimo hy plaintiffs have heen in-eladedj as it has been feund that the hears ef travel listed de net meet the requirements ef the applicable statute *218 Sta-t- 4446-f 5- U.S.C.- 912-(-b)-)- (quoted is fading 44) fen in-
CONCLUSION OF LAW
paidj and without allowance ef any heuvs spent in travel status and elaitned fey plaintiffs as overtime-,- and with an tive date ef the 4954 amendment at regular- overtime rates.Judgment is entered to this effect,- -with the amount due each plaintiff to fee determined in further proceedings under ■Bulo 38(e)-
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs in these actions are entitled to recover regular overtime pay for the periods involved in this litigation up to July 1,1955, and to recover, for the irregular, unscheduled overtime work performed by them during the periods covered by their respective claims after July 1, 1955, 15 percent premium compensation on an annual basis computed under section 401(2) of the Federal Employees Pay Act of 1945, as amended in 1954, 68 Stat. 1111, and under the same regulations of the Civil Service Commission and the Alcohol and Tobacco Tax Division that were applicable to the same class of investigators during the same period of this litigation, less any premium compensation already paid plaintiffs for such duty and less compensatory time-off actually received, and without any allowance for hours spent in travel status and claimed by plantiffs as overtime. Judgment is entered to this effect, with the amount due each plaintiff to be determined in further proceedings under Rule 38 (c).

 These five claims were consolidated for purposes of trial. Although a total of 65 plaintiffs wejre named in the five petitions filed with the court, counsel has elected to propose findings which relate to compensation (overtime pay) claimed by only seven of the plaintiffs originally designated.

 The practice of “adopting” eases is followed by other Federal law enforcement agencies, such as the Federal Bureau of Investigation.

 Insofar as Alcohol and Tobacco Tax investigators are concerned, section 7.02 of the Internal Revenue Service Mimeograph No. 57 — 39, provides: “Normally the tour of duty of Service employees falls between 8 :00 a.m. to 6 :00 p.m. However, Special Investigators and Investigators need not be required to observe such a daily tour of duty. In fact it is questionable if the establishment of such hours of duty for those employees is in the best interest of the employees and the Service.”

 Section 1 of the daily report (Form 1494) is likewise titled “Diary.”

 The record discloses one instance involving an incorrect claim for per diem by one of the plaintiffs. However, that incident did not involve the claimed performance of overtime, and the claimed per diem allowance resulted from a misunderstanding involving the plaintiff’s supervisor. There is no evidence of any disciplinary action in connection with that occurrence. The plaintiff concerned continued in Government service, obtained promotiftns, and was rated satisfactory or better subsequent to the event.

 The number of investigators in the San Francisco Region decreased from 62 in 1055 to 46 in April of 1961.

 As revised and amended November 1, 1954, effective at the beginning of tbe first pay period which begins after October 31, 1954.

 It is defendant’s contention that the investigators called by counsel for plaintiffs were not typical of the total group of 65 plaintiffs involved in the five petitions.